## MILKIE et al. v. WEST.

### No. 6542.

United States Court of Appeals
Fourth Circuit.

Argued March 18, 1953.

Decided April 7, 1953.

Gerald E. Topper (Charles A. Velte, Baltimore, Md., Jno. C. Goddin and Shewmake, Gary, Goddin & Blackwell, Richmond, Va., on brief), for appellants.

Jack L. Medwedeff, Baltimore, Md. (Cornelius P. Mundy, Baltimore, Md., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This suit was instituted on August 4, 1950 on behalf of Michael Milkie and Gabriel Milkie, citizens of Maryland, to secure the rescission of a contract of June 30, 1949 wherein the Milkies, sole stockholders of Royal Transportation Company, a Maryland corporation, agreed to sell and convey all of the stock of the company to H. B. West, a citizen of New Jersey. The defendant West filed an answer and a counterclaim in which he asserted that he had complied with the terms of the contract of sale and prayed that the contract be declared in full force and effect and that the Milkies be ordered to transfer the stock to him upon the payment by him of the sum of $10,242.57, at the rate of $1,000 per month, the stock to be held in escrow until the payments were completed. He asserted that this sum had been agreed upon by the parties in March, 1950 as the balance due under the contract.

Although the complaint asked for the rescission of the contract and the removal of West from the control of the corporation which had been transferred to him, the complaint also asked for the appointment of an auditor to determine the amount of money due by West under the terms of the contract. Furthermore the Milkies stated in their answers to the counterclaim that the stock had been endorsed and was in the hands of their attorney, and that they were willing to deliver the stock to West upon compliance by him with the terms of the contract; but the execution of the supplemental agreement of March, 1950 was denied and it was asserted that the Milkies were owed a sum in excess of $20,000 under the original contract.

In this state of the pleadings, the case came to trial upon the question of the amount owing by the defendant under the terms of the contract. This provided for the sale of the outstanding stock of the corporation, consisting of 40 shares owned by the Milkies, for $140,000 plus an amount equal to the accounts receivable as of the close of business on July 4, 1949, and less the debts of the corporation which the purchaser agreed to pay. The purchase price was to be paid as follows: $5,000 upon the signing of the agreement, to be used to reduce the corporation's debts, $25,000 within thirty days, to be used for this purpose and also for operating capital, "and thereafter to pay to Royal and/or parties of the first part not less than $1,000.00 per month without interest until the purchase price of $140,000.00 plus the value of the receivables owing to Royal is paid in full; provided, however, that party of the second part may refuse to pay any amount to parties of the first part until an accurate accounting of the liabilities of Royal has been determined, it being expressly understood that the total purchase price to be paid by party of the second part is $140,000.00 plus the amount of receivables and amounts payable to Royal, and that parties of the first part are not entitled to any monies, should the indebtedness of Royal equal or exceed the $140,000.00 stated, plus the receivables and amounts due Royal."[1]

For the determination of the amount of the purchase price to be ultimately paid, Article 5 of the agreement provided that a certified public accountant would be employed "to make an audit of the books of Royal to determine both the amounts owing to Royal and the amounts owed by it as of the conclusion of business July 4, 1949." During the month of July, 1949, in conformity with this provision, the parties jointly employed Alexander P. Ginsberg, a certified public accountant, to audit the records of the corporation and to ascertain the amounts of the accounts receivable and accounts payable. During the hearing in the District Court the plaintiffs contended that Ginsberg had been employed by West and not by them, but the District Judge found that Ginsberg was employed by both parties, as contemplated by the contract, and the weight of the evidence strongly supports his finding.

It was expressly stated in paragraph I of the contract that the purpose of the sale and purchase was the acquisition by West of all interest in and to the assets and properties of Royal, consisting of certain motor carrier operating rights under a certificate of public convenience and necessity issued by the Interstate Commerce Commission; all motor vehicle equipment; all office and shop equipment, materials and supplies, wherever located; all leaseholds of terminal properties, wherever situated; and all amounts due to Royal from whatever source and owing as of July 4, 1949. In order to give effect to this purpose West was elected president and director of the corporation on or about July 16, 1949 and has since been in complete charge and control of the assets. The certificates of stock, however, were not delivered to him but were endorsed by the sellers and placed in the hands of their attorney for delivery upon the completion of the payments due under the contract.

At the time that the contract was executed, the corporation was in dire financial straits and certain creditors were about to institute foreclosure proceedings against its operating equipment. It was on this account that it was provided in paragraph 3 of the agreement that the purchaser, upon the signing of the paper, should pay $5,000 to be used in reducing the corpora-

1. It is evident that the amount paid by the purchaser in liquidation of the corporation's debts was to be considered as a credit on the purchase price; and it was so treated in paragraph VII of the bill of complaint where it was expressly stated. "That pursuant to the terms of the contract, the consideration for said stock was to be the difference between $140,000.00 plus all of the receivables of the Royal Transportation Company, less the liabilities, as of July 2, 1949." The suggestion somewhat faintly made in the appellants' brief in this court that the agreement does not recite that the liabilities were to be subtracted from the amount of the purchase price is not worthy of further comment.

tion's debts. The sum of $5,000 was in fact immediately paid and used in accordance with the contract. Shortly thereafter the purchaser also paid the sum of $25,000 in accordance with the contract, and the additional sum of $1,000, so that the pressing obligations of the company might be met. The additional payments of $1,000 per month were not made since the purchaser was not required by the contract to make them until an accurate account of the liabilities had been ascertained; but the purchaser has remained in possession and has operated the business successfully without further interference on the part of the creditors.

The Ginsberg audit of the books and records of the corporation was completed on November 5, 1949. It showed as of July 4, 1949 total assets of $63,222.12 and total liabilities of $159,642.49, or a deficit of $96,420.37. Taking into account on the one hand the purchase price of $140,000 and accounts receivable and special deposits of $35,281.58, or a total of $175,281.58, and on the other hand accounts payable in the aggregate sum of $173,385.74, the computation showed an amount due the sellers of $1,895.84.

The Milkies were not satisfied with this computation and negotiations followed during which, according to the testimony of the defendant, the parties agreed upon a settlement in the sum of $10,242.57. This settlement, however, was not given effect and the present suit was brought on August 4, 1950.

Upon this state of facts the case came on for hearing at which the attention of the court was chiefly confined to questions of the validity of the agreement, the employment of Ginsberg as the auditor, the accuracy of his report and the alleged execution of the supplemental agreement of settlement above mentioned. At the conclusion of the hearing the judge announced the finding that the evidence was not sufficiently convincing to satisfy him that there had been an accord and satisfaction, and he further held that although the parties had agreed to accept the services of Ginsberg to make the audit, they had not agreed in advance to accept his computation, and

that therefore a special master should be appointed to determine the amount remaining due under the contract. Accordingly, the court filed an order in which he found that the contract was valid and subsisting; that the parties had agreed upon Ginsberg as the accountant to make the audit, that his audit made should be treated as prima facie evidence of the rights and liabilities of the parties, and that Paul R. Kach be appointed special master to hear and determine the rights and liabilities of the parties and report his findings to the court, taking into consideration the Ginsberg audit and such additional evidence as the parties might offer.

The special master took a large amount of additional testimony and reached the final conclusion that the balance due the plaintiffs as sellers of the stock was $5,189.13. Exceptions to his report were considered by the court and it was confirmed in all respects; and a decree was signed in which the plaintiffs were ordered to deliver their stock to West upon the payment by him of the sum of $5,189.13 and upon the payment by the corporation to the plaintiffs of certain additional sums found by the Ginsberg audit to be due them as creditors of the corporation, less amounts theretofore paid on account.

After the opinion of the District Judge was filed, the plaintiffs employed other counsel to prosecute this appeal. It does not challenge the accuracy of the computation made by the District Court or endeavor to show what part of the purchase price remains unpaid. It is confined to the propositions: (1) that the agreement of June 30, 1949 is so ambiguous and incomplete in its terms as to be incapable of specific performance under the Maryland decisions; and (2) that the District Court erred in confining its consideration to one of the provisions of the agreement and in not considering the agreement in its entirety.

In respect to the first proposition it is said that certain parts of the contract seem to contemplate the transfer of the corporate assets to West while others speak of the sale and transfer to him of the entire capital stock; and that the agreement does

not clearly state that the initial payment of $5,000 was part of the consideration of the transfer, or that the liabilities were to be subtracted from the purchase price, or designate the persons to whom the debts should be paid.

Especial emphasis is placed by the appellants upon the concluding paragraph of the agreement which includes the statement that the Milkies "may continue with Royal as stockholders and full-time employees, provided, however, that their combined stock interest may not exceed 25 per cent of the total capital stock of Royal issued and outstanding at any one time, and that for the purpose of this agreement, the cost of the said capital stock to be issued to parties of the first part or either of them shall be $3,500.00 per share on the basis of forty shares," * * * and "that upon issuance of any share or shares of stock to parties of the first part or either of them, a credit for the value thereof shall be given to party of the second part in reduction of his indebtedness to parties of the first part in the amount of $140,000.00."

It is said that the provision for full employment is unenforceable under the rule that courts will not enforce agreements requiring or permitting personal service, and will not interpose to enforce one part of a contract unless it is clearly separable from the remainder;[2] and that in this instance the rule is particularly appropriate because Michael Milkie, who had been carried on the pay roll for nearly two years after the execution of the contract, was discharged from his employment on September 28, 1951.

We find no merit in these contentions. The articles of agreement were not drawn with technical nicety and they contain expressions which fail to observe with precision the distinction between the corporate entity and the purchaser of all of its stock who was to become in a very real sense the owner of the business. But, as we have pointed out, the parties clearly understood and have acted on the assumption that the sale was to be accomplished by the transfer of the stock and that the cor-

poration was to continue as the owner of the corporate property and the operator of the business. West was elected president and director of the corporation, and he was given control of the business; but the properties of the corporation were not transferred to him, and the stock was retained by the Milkies during the inquiry into the amount of the assets and liabilities of the business. In other words, the terms of the contract were performed so far as this could be done pending this investigation to which the parties directed their attention. There is mention in the pleadings of rescission and of specific performance, but the main purpose of the suit was the computation and collection of the purchase price, and there is no occasion to apply the Maryland rule that a contract will not be specifically enforced unless it is definite and certain in its terms and free from ambiguity. See, Applestein v. Royal Realty Corp., 180 Md. 274, 23 A.2d 684.

The terms of the final paragraph of the agreement and the discharge of Michael Milkie likewise present no obstacle to the present enforcement of the contract. It is clear that the right of the Milkies to remain as employees was part and parcel of their right to remain as stockholders of the corporation, and that this right was optional with the Milkies and subject to the proviso that they pay for the stock at the rate of $3,500 per share. When it was disclosed by the audit that the stock had little or no value, the option to buy it at this price was worth less than nothing and of course it was never exercised. Nor was any attempt made by the Milkies during the trial of the case to exercise this right.

What has been said also answers the contention that the District Judge confined the trial exclusively to one of the provisions of the agreement. The argument seems to be based upon a statement of the District Judge during the opening statement of counsel that he was disposed to confine the testimony to paragraph 5 of the agreement wherein the parties agreed to the employment of an auditor to determine the amount of the accounts receiva-

2. See Pantages v. Grauman, 9 Cir., 191 F. 317; Restatement of Contracts, Vol. 1 § 371.

ble and the amount of the accounts payable. The reason given was that the contract might be ineffective unless the parties had complied with the provision whereby the amount of the purchase price could be ascertained. The judge, however, expressly said that attention should be confined to this point "initially"; and the record shows that the judge found that the parties had agreed upon the appointment of an auditor and that during the subsequent court proceedings the parties had ample opportunity to present evidence and to secure the consideration by the court as to all parts of the agreement.

The judgment of the District Court will be

Affirmed.